UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

GARY R.G.,                                    )     Case No. ED CV 17-1056-SP
                                              )
            Plaintiff,                        )
                                              )
      v.                                      )     MEMORANDUM OPINION AND
                                              )     ORDER
                                              )
NANCY A. BERRYHILL,                           )
Deputy Commissioner for Operations of         )
Social Security Administration,               )
                                              )
            Defendant.                        )
                                              )
_____       )

**I.**

**INTRODUCTION**

On May 25, 2017, plaintiff Gary R.G. filed a complaint against defendant,

the Commissioner of the Social Security Administration ("Commissioner"),

seeking a review of a denial of a period of disability, disability insurance benefits

("DIB"), and supplemental security income ("SSI"). Both plaintiff and defendant

have consented to proceed for all purposes before the assigned Magistrate Judge

pursuant to 28 U.S.C. § 636(c). The court deems the matter suitable for

adjudication without oral argument.

Plaintiff presents what are really four issues for decision: (1) whether the administrative law judge ("ALJ") gave specific, legitimate reasons for rejecting the opinions of two treating physicians; (2) whether the ALJ's residual functional capacity ("RFC") determination was supported by substantial evidence; (3) whether the ALJ properly considered plaintiff's credibility; and (4) whether the ALJ failed to properly consider the opinions of a lay witness. Plaintiff's Memorandum in Support of the Complaint ("P. Mem.") at 2-3; Defendant's Memorandum in Support of Answer ("D. Mem.") at 1-10.

Having carefully studied the parties' written submissions, the Administrative Record ("AR"), and the decision of the ALJ, the court concludes that, as detailed herein, the ALJ properly considered the opinions of plaintiff's treating physicians, and the ALJ's RFC determination was supported by substantial evidence. But the ALJ failed to properly consider plaintiff's credibility, and failed to properly consider lay witness testimony. The court therefore remands this matter to the Commissioner in accordance with the principles and instructions enunciated in this Memorandum Opinion and Order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was fifty-eight years old on his amended alleged disability onset date.[1] AR at 45, 86, 97. Plaintiff completed the twelfth grade, and has past relevant work as a combination shipping and receiving supervisor, receiving clerk, and purchasing clerk. *Id.* at 73, 217.

Plaintiff filed an application for DIB on November 26, 2013 and for SSI on November 30, 2013, due to two shoulder surgeries, neck surgery, diabetes, vertigo,

---

[1] Plaintiff initially alleged an onset date of January 10, 2011 (*see* AR at 193), but later amended his alleged onset date to August 5, 2013, the date of his automobile accident. *Id.* at 43-45.

impaired hearing, and high cholesterol. *Id.* at 86-87, 97-98. The applications were denied initially and upon reconsideration, after which he filed a request for a hearing. *See id.* at 136-41, 144-49, 150-51.

On October 27, 2015, plaintiff, represented by counsel, appeared and testified at a hearing before the ALJ. *Id.* at 39-85. The ALJ also heard testimony from Corinne Porter, a vocational expert. *Id.* at 59-84. On January 27, 2016, the ALJ denied plaintiff's claims for benefits. *Id.* at 20-33.

Applying the well-known five-step sequential evaluation process, the ALJ found, at step one that plaintiff had not engaged in substantial gainful activity since August 5, 2013, the amended alleged onset date. *Id.* at 25.

At step two, the ALJ found plaintiff suffered from the following severe impairments: obesity, degenerative disc disease of the cervical spine status post anterior cervical fusion at C5-C6, cervical radiculopathy, cervical spondylosis, impingement syndrome of the right shoulder, degenerative disc disease of the lumbar spine, and diabetes mellitus. *Id.*

At step three, the ALJ found plaintiff's impairments, whether individually or in combination, did not meet or medically equal one of the listed impairments set forth in 20 C.F.R. part 404, Subpart P, Appendix 1 (the "Listings"). *Id.* at 27.

The ALJ then assessed plaintiff's RFC,[2] and determined he had the RFC to perform "light work," with the limitations that plaintiff: could occasionally push or pull with his bilateral upper extremities; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; could occasionally reach overhead with the

---

[2] Residual functional capacity is what a claimant can do despite existing exertional and nonexertional limitations. *Cooper v. Sullivan*, 880 F.2d 1152, 1155-56 n.5-7 (9th Cir. 1989). "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n.2 (9th Cir. 2007).

bilateral upper extremities; and is precluded from climbing ladders, ropes or scaffolds. *Id.*

The ALJ found, at step four, that plaintiff was unable to perform his past relevant work as a combination shipping and receiving supervisor, receiving clerk, or purchasing clerk. *Id.* at 30.

At step five, the ALJ determined that, based upon plaintiff's age, education, work experience, and RFC, plaintiff could perform jobs that exist in significant numbers in the national economy, including purchasing clerk and data entry. *Id.* at 31-32. Consequently, the ALJ concluded plaintiff did not suffer from a disability as defined by the Social Security Act ("SSA"). *Id.* at 32-33.

Plaintiff filed a timely request for review of the ALJ's decision, which was denied by the Appeals Council. *Id.* at 1-6. The ALJ's decision stands as the final decision of the Commissioner.

### III.

### STANDARD OF REVIEW

This court is empowered to review decisions by the Commissioner to deny benefits. 42 U.S.C. § 405(g). The findings and decision of the Social Security Administration must be upheld if they are free of legal error and supported by substantial evidence. *Mayes v. Massanari*, 276 F.3d 453, 458-59 (9th Cir. 2001) (as amended). But if the court determines the ALJ's findings are based on legal error or are not supported by substantial evidence in the record, the court may reject the findings and set aside the decision to deny benefits. *Aukland v. Massanari*, 257 F.3d 1033, 1035 (9th Cir. 2001); *Tonapetyan v. Halter*, 242 F.3d 1144, 1147 (9th Cir. 2001).

"Substantial evidence is more than a mere scintilla, but less than a preponderance." *Aukland*, 257 F.3d at 1035. Substantial evidence is such "relevant evidence which a reasonable person might accept as adequate to support

4

a conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998); *Mayes*, 276 F.3d at 459. To determine whether substantial evidence supports the ALJ's finding, the reviewing court must review the administrative record as a whole, "weighing both the evidence that supports and the evidence that detracts from the ALJ's conclusion." *Mayes*, 276 F.3d at 459. The ALJ's decision "'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Aukland*, 257 F.3d at 1035 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). If the evidence can reasonably support either affirming or reversing the ALJ's decision, the reviewing court "'may not substitute its judgment for that of the ALJ.'" *Id.* (quoting *Matney v. Sullivan*, 981 F.2d 1016, 1018 (9th Cir. 1992)).

# IV.

## DISCUSSION

## A.    The ALJ Properly Assessed the Medical Opinion Evidence

Plaintiff asserts the ALJ erred because she failed to give specific and legitimate reasons for rejecting the opinions of two treating physicians, Dr. Angela C. Williams and Dr. James E. Shook. P. Mem. at 3-6.

### 1.    The Medical Evidence

Plaintiff was involved in a motor vehicle accident on August 5, 2013, in which he immediately experienced pain in his neck and upper back, and began to experience shoulder pain the next day. AR at 304. Prior to the date of the accident, which is also the amended alleged disability onset date, plaintiff underwent neck surgery in 2008, left shoulder surgery in 2003, and right shoulder surgery in 2000. *See id.* at 306, 316. Plaintiff also had a bulging disc injury at C3-C4 in December 2008, which was treated with pain medicine and from which he fully recovered. *Id.*

On August 30, 2013, plaintiff underwent a CT scan of his cervical spine. *Id.*

at 302-03. Notably, the examination revealed a finding in the left side facet joint at C2-C3 likely secondary to severe facet arthropathy, post-surgical changes consistent with anterior cervical discectomy, fusion at C3-C4 with anterior fixation plate, and screws and evidence for partial fusion at C5-C6 and C6-C7. *Id.*

On May 4, 2014, plaintiff presented to the emergency department at Chino Valley Medical Center in Chino, California with a chief complaint of low back pain. *Id.* at 371-73. Plaintiff described dull, intermittent, 8/10 pain, but denied numbness or tingling. *Id.* at 372. Plaintiff had a negative straight leg raise bilaterally. *Id.* at 373. Plaintiff was taking 400mg of Motrin without improvement. *Id.* Plaintiff was treated with 60mg of Toradol, and he was discharged home to be treated with further medications. *Id.* at 373, 374, 379.

On July 4, 2014, plaintiff again presented to the emergency department at Chino Valley Medical Center with a chief complaint of lower back pain. *Id.* at 360-62. Plaintiff took pain medications, primarily Norco and some ibuprofen, yet this provided him insufficient pain relief. *Id.* at 361. Both plaintiff and his wife indicated a stronger pain medication or muscle relaxer may be more beneficial to treat his pain, though he had not undergone physical therapy, chiropractic evaluation or treatment, or image testing. *Id.* A physical examination revealed plaintiff was not in distress, and he denied weakness or numbness in his lower extremities. *Id.* at 361-62. An x-ray of plaintiff's lumbosacral spine was ordered, and he was diagnosed with chronic low back pain. *Id.* at 363, 366-69. The x-ray results revealed degenerative disc disease at L2-L3, and to a lesser extent at L3-L4, and facet hypertrophy at L5-S1 bilaterally. *Id.* at 366, 370.

On August 14, 2014, plaintiff underwent an MRI examination of his lumbar spine. *Id.* at 443-44. The MRI revealed: a broad-based 2mm disc bulge, slight increased signal in the facets, anterior osteophytic spurring, and loss of height of the disc at L2-L3; a broad-based 2mm disc bulge with loss of height of the disc, slight bilateral neuroforaminal encroachment, and slight increased signal in the

facets at L3-L4; slight increased signal in the facets at L4-L5; and slight increased signal in the facets at L5-S1.  *Id.*

## 2. The Medical Opinions

### a. Treating Physicians

**Dr. Etemadian**

Dr. Ali Mohammad Etemadian intermittently treated plaintiff between 2009 and 2014.  *See id.* at 418-20, 429-32, 434-38.  On July 28, 2014, Dr. Etemadian treated plaintiff's neck pain, and noted diagnoses of cervical spine degeneration, low back pain, osteoarthritis, and herniated cervical spine with radiculopathy.  *Id.* at 429-31.  Dr. Etemadian noted plaintiff reported he was "unsteady on his walking" and had some numbness in his left leg.  *Id.* at 429.  Dr. Etemadian reviewed the lumbar spine x-ray results discussed above.  *Id.* at 418, 430.

**Dr. Fu**

On August 8, 2014, Dr. Morgan Mau Jin Fu treated plaintiff.  *Id.* at 439, 440-42.  In a treatment progress note, Dr. Fu observed the absence of both ankle jerks and an unsteady gait that requires the assistance of plaintiff's wife.  *Id.* at 439.  Dr. Fu assessed plaintiff had lumbar radiculopathy and cervical radiculopathy.  *Id.*

**Dr. Williams**

Dr. Angela C. Williams was plaintiff's treating physician at the Jerry L. Pettis Memorial Veterans Hospital in Loma Linda, California from January 2015 to October 2015.  *See id.* at 543-49, 554, 572, 578-79, 579-81, 615-16, 625-30, 686, 695, 703-08.  On January 8, 2015, Dr. Williams performed an initial consultation.  *Id.* at 704.  Dr. Williams noted plaintiff had diabetes, numbness at his distal legs, a history of cervical spine surgery in 2008, neck pain, right knee pain, and a ventral hernia.  *Id.*  Plaintiff screened positive for depression.  *Id.* at 707.  In February 2015, plaintiff described his level of pain as being at "5," and Dr. Williams increased plaintiff's prescription of hydrocodone and acetaminophen to improve his pain control.  *Id.* at 658.  In April 2015, Dr. Williams noted improvement in

plaintiff's diabetes control, but he had ongoing chronic neck pain, elbow pain, and sleep disturbance. *Id.* at 628. Dr. Williams increased plaintiff's dosage of Gabapentin. *Id.* Dr. Williams opined on April 23, 2015 that plaintiff had trouble with "lifting and prolonged sitting and standing," and that he "would likely have continued difficulty with employment." *Id.* at 426, 615-16.

On June 9, 2015, Dr. Williams completed a medical opinion questionnaire about plaintiff's ability to do work-related activities. *Id.* at 718-20. Dr. Williams assessed plaintiff could occasionally lift or carry 10 pounds, frequently lift or carry less than 10 pounds, and stand, walk, or sit about two hours during a workday. *Id.* at 718. Dr. Williams further opined plaintiff could occasionally twist, stoop, crouch, climb stairs, and climb ladders, but he had limitations reaching and pushing or pulling based on subjective numbness in his upper extremities. *Id.* at 719. She also found plaintiff had to avoid concentrated exposure to noise, fumes, odors, dusts, gases, poor ventilation, and hazards, avoid moderate exposure to extreme heat, and avoid all exposure to extreme cold, wetness, and humidity. *Id.* at 720. Dr. Williams also limited plaintiff's kneeling and crawling due to lumbar spine radiculopathy. *Id.*

In July 2015, Dr. Williams reviewed hip and spine x-rays, and observed diffuse increased radioactivity in the cervical vertebral bodies with degenerative change, particularly along C5, C6, and C7. *Id.* at 579-81. During a visit in August 2015, Dr. Williams observed plaintiff had successfully improved control over his diabetic condition, but neck and shoulder pain remained. *Id.* at 543. Upon review of CT scans of plaintiff's neck, Dr. Williams assessed the left C3-C4 facet joint was markedly narrowed, chronic facet degenerative changes were worst at C2-C3 on the left side, multilevel chronic degenerative disc disease with mild central spinal canal narrowing at C7-T1, and neuroforaminal stenoses. *Id.* at 545. Pain management with Norco and Gabapentin was prescribed. *Id.* at 546.

**Dr. Shook**

Dr. James E. Shook, an orthopedic surgeon at the Jerry L. Pettis Memorial Veterans Hospital, also treated plaintiff. *See id.* at 52, 554-55, 588-89. On June 11, 2015, Dr. Shook noted plaintiff ambulated without myelopathic findings. *Id.* at 588-89.

On August 15, 2015, Dr. Shook submitted a questionnaire opining on plaintiff's ability to perform work-related activities. *Id.* at 510-12. Dr. Shook opined plaintiff had the functional capacity to occasionally lift and carry 10 pounds, frequently lift and carry less than 10 pounds, and stand, walk, and sit for about two hours during an eight-hour workday. *Id.* at 510. Dr. Shook further opined plaintiff had postural limitations, as he could only occasionally twist and climb stairs, but he could never stoop, crouch, or climb ladders. *Id.* at 511. He noted impairments in plaintiff's physical functions, including reaching, handling, fingering, feeling, and pushing or pulling due to pain in plaintiff's neck and shoulder numbness, and based on x-ray, CT, MRI findings. *Id.* Lastly, Dr. Shook assessed plaintiff had environmental limitations to avoid concentrated exposure to extreme heat or cold, and to avoid all exposure to hazards such as machinery and heights. *Id.* at 512. Dr. Shook opined that plaintiff's impairments would cause him to be absent from work more than three times per month. *Id.*

Later in August 2015, Dr. Shook scheduled plaintiff to have injections for his pain management, and noted plaintiff was to return to orthopedic surgery one month after injections in his neck. *Id.* at 555.

**Dr. Patchett**

On October 1, 2013, Dr. Clayton Patchett, an orthopedic surgeon, performed an evaluation based on a review of plaintiff's medical records and a physical examination, shortly after plaintiff's August 5, 2013 vehicular accident. *See id.* at 304-14. Plaintiff complained of moderate headaches and neck pain, slight bilateral shoulder pain and upper back pain, stiffness and grinding in his neck, and pain at night in his head and neck. *Id.* at 305. With respect to plaintiff's cervical spine,

Dr. Patchett opined plaintiff had tenderness of the posterior neck muscles bilaterally, and gross muscle strength testing was 3/5 with left lateral flexion and left rotation. *Id.* at 307. Dr. Patchett also assessed plaintiff's deep tendon reflexes were 1+ at the biceps, triceps, and brachioradialis bilaterally, and his range of motion was restricted. *Id.* Dr. Patchett noted a Supraspinatus test was positive, there was general muscle weakness in the shoulders secondary to pain, and manual muscle testing of the shoulder girdles was 4+/5 with abduction, adduction, internal rotation, external rotation, extension, and flexion. *Id.* at 308. Plaintiff's range of motion was restricted, he had tenderness over the anterior aspect of the acromioclavicular joints, and there was a 7-finger saber cut over the incision of the left shoulder. *Id.* Plaintiff had normal gait and posture without apparent distress. *Id.* at 312. Dr. Patchett noted plaintiff's grip strength was 30/28/26 kilograms on the right, and 30/28/28 kilograms on the left, and he had no diminished feeling, numbness, or tingling in his hands. *Id.* at 312, 314. Dr. Patchett recommended plaintiff seek further care and treatment, while commenting the treatment to that point was "conservative with traditional static therapy techniques." *Id.* at 313.

Dr. Patchett treated plaintiff until November 2013. *See id.* at 326-42. Dr. Patchett advised a spine consultation and possible therapy. *Id.* at 339, 341-42. Over the course of treatment, plaintiff initially described shoulder and neck pain as being between 4/10 and 5/10 (*see id.* at 336, 337), but both levels of pain were later described as 4/10 and improving, although still constant. *See id.* at 330, 334, 336. Dr. Patchett prescribed pain medications, anti-inflammatory medications, and muscle relaxants, along with rehabilitation. *Id.* at 326, 333.

### b. Examining Physicians

### Dr. Etemad

On November 1, 2013, Dr. Alex H. Etemad, an orthopedic spine surgeon, evaluated plaintiff's complaints of headaches, neck pain, and bilateral shoulder pain upon reviewing his past medical history and performing a physical

10

examination. *Id.* at 315-24. Dr. Etemad observed plaintiff's cervical spine had tenderness of the posterior neck muscles on the right, trigger points in the posterior neck area on the right, and a spasm over the right trapezius muscle. *Id.* at 317. Dr. Etemad assessed muscle testing revealed 4/5 strength with flexion, extension, lateral flexion and rotation, restricted range of motion, and general muscle weakness secondary to pain on the right. *Id.* Dr. Etemad noted a Supraspinatus test was positive in the right and left shoulders, Hawkin's, Neer's, O'Brien's, and Abduction's tests were 2+ in plaintiff's right shoulder and 1+ in his left shoulder, 4/5 strength with abduction, internal rotation, and flexion, and restricted range of motion in the shoulders due to pain. *Id.* at 317-18. He also observed plaintiff had full motion of the hands, no gross weakness in the hands or wrists, no complaints of numbness in the fingers, and no loss of motion in the wrists. *Id.* at 319. Plaintiff's grip strength was measured as 22/24/26 on the right, and 30/30/28 on the left. *Id.* at 321. Dr. Etemad did not assess any issues with plaintiff's ankles, feet, or knees, and found plaintiff was able to ambulate without complaint. *Id.*

Dr. Etemad opined plaintiff was temporarily or partially disabled, but that he could continue working with restrictions limiting overhead work and lifting over 25 pounds. *Id.* at 323. Dr. Etemad advised a treatment plan of physical therapy rehabilitation, pain medications, and epidural steroid injections. *Id.* at 324, 329.

**Dr. Bernabe**

On May 8, 2014, Dr. Vicente R. Bernabe, another orthopedic surgeon, performed a complete orthopedic consultation of plaintiff's conditions based on his examination and a review of plaintiff's medical records and complaints. *Id.* at 352-58. Plaintiff presented with complaints of neck and shoulder pain arising from his auto accident. *Id.* at 352. Plaintiff described his pain as sharp and throbbing. *Id.* Plaintiff had received heat and massage treatment; although, at the time of the consultation, he was only receiving pain medication including ibuprofen, which he found unhelpful. *Id.* Dr. Bernabe noted plaintiff had tenderness of the

cervicothoracic junction in the cervical spine and a positive Spurling's test on the right. *Id.* at 353-54. On plaintiff's upper extremities, Dr. Bernabe assessed positive impingement sign on the right shoulder, pain and crepitus at the acromioclavicular joint, and range of motion within normal limits with pain at the terminal range of motion. *Id.* at 354. He did not find any issues with plaintiff's elbows, wrists, or hands. *Id.* Plaintiff had a normal gait. *Id.* at 353.

Dr. Bernabe opined plaintiff had the functional capacity to: lift and carry 50 pounds occasionally and 25 pounds; frequently push and pull; walk, stand, and sit for six hours out of an eight-hour day; and frequently walk on uneven terrain, climb ladders, and work at heights. *Id.* at 356. Dr. Bernabe found plaintiff did not have manipulative restrictions for fingering, handling, feeling, and reaching. *Id.* As to postural limitations, Dr. Bernabe opined plaintiff could bend, crouch, stoop, and crawl frequently. *Id.*

**Dr. Ali**

Dr. Mohsen Ali, a neurologist, performed a neurological evaluation of plaintiff on October 18, 2014 to address plaintiff's complaint of neck pain. *Id.* at 487-88, 490-91. Dr. Ali found plaintiff had significantly reduced range of motion in his neck in all directions, and reduced range of motion in his lumbar spine with positive straight leg raising sign on the left side. *Id.* at 488. Dr. Ali observed plaintiff's stance and gait were normal, and there was no evidence of focal muscle atrophy or weakness. *Id.* Dr. Ali opined plaintiff had cervical radiculopathy and lumbar radiculopathy, and scheduled an EMG examination of his left arm and left leg. *Id.* Dr. Ali performed the EMG and a nerve conduction study on November 8, 2014. *Id.* at 477-86. The nerve conduction study revealed normal motor and serve nerve conduction, but the EMG was abnormal due to the presence of chronic denervation involving C5 and C6, which was consistent with chronic cervical radiculopathy. *Id.* at 477.

        c.      **Non-Examining Physicians**

## Dr. Kalmar

On May 29, 2014, Dr. F. Kalmar, a non-examining state physician, reviewed plaintiff's medical records and assessed his RFC. *Id.* at 91-95. Dr. Kalmar found plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, and stand, walk, and sit about six hours during a workday. *Id.* at 93. Dr. Kalmar further opined plaintiff had pushing or pulling limitations in both his upper extremities due to cervical radiculitis and right upper extremity impingement syndrome. *Id.* Dr. Kalmar also opined plaintiff had postural limitations, in that he could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but he could never climb ladders, ropes, or scaffolds. *Id.* at 93-94. He found plaintiff had some manipulative limitations – including limited left and right overhead reaching, limited handling on his right side, and unlimited fingering and feeling – but no visual or communicative limitations. *Id.* at 94. He also found plaintiff had environmental limitations to avoid concentrated exposure to extreme cold, vibration, and hazards such as machinery and heights. *Id.* at 94-95.

## Dr. Pancho

On August 26, 2014, Dr. L. Pancho, another non-examining state physician, also reviewed plaintiff's medical records and assessed his RFC. *Id.* at 114-18. Dr. Pancho's opinions as to plaintiff's exertional, postural, manipulative, visual, communicative, and environmental limitations were identical to those found by Dr. Kalmar. *See id.* at 116-18.

### 3.    The ALJ's Findings

Based on her reading of the medical evidence, the ALJ determined plaintiff had the RFC to perform light work, but with the limitations that he: could occasionally use his bilateral upper extremities for pushing, pulling, and reaching overhead; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl; and is precluded from climbing ladders, ropes, or scaffolds. *Id.* at 27.

The ALJ gave little weight to the opinions of Dr. Williams and Dr. Shook

13

"that the claimant can lift no more than 10 pounds, can sit or stand/walk fewer than two hours, and would be subject to further environmental and environmental limitations," because she found them unsupported by clinical findings, exceeded limitations reflected by clinical examinations, and were based largely on plaintiff's subjective allegations. *Id.* at 30. The ALJ gave significant weight to Dr. Etemad's opinions because they were consistent with his documented observations. *Id.* The ALJ also afforded some weight to the opinions of the non-examining state physicians because, although the ALJ agreed plaintiff was able to perform light work, their limitations on handling for plaintiff's right upper extremity were not consistent with the objective evidence showing no observation of deficient functionality for his manipulation and nerve testing found no abnormality suggesting a loss of capability. *Id.* Some weight was also accorded to Dr. Bernabe's opinion, but found further restrictions than those opined by Dr. Bernabe were appropriate given plaintiff's treatment history, diagnoses, and some of his subjective allegations. *Id.*

### 4. The ALJ Did Not Err in Rejecting the Opinions of Dr. Williams and Dr. Shook

The ALJ has a duty to consider all relevant medical evidence to reach an RFC determination. *See* 20 C.F.R. § 404.1545(a)(1) (it is the responsibility of the ALJ to reach an RFC determination by reviewing and considering all of the relevant evidence).[3] In evaluating medical opinions, the regulations distinguish among three types of physicians: (1) treating physicians; (2) examining physicians; and (3) non-examining physicians. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). "Generally, a treating physician's opinion carries more weight than a reviewing physician's." *Holohan v.*

---

[3] All citations to the Code of Federal Regulations refer to regulations applicable to claims filed before March 27, 2017.

14

*Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001); 20 C.F.R.     §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2). The opinion of the treating physician is generally given the greatest weight because the treating physician is employed to cure and has a greater opportunity to understand and observe a claimant. *Smolen v. Chater*, 80 F.3d 1273, 1285 (9th Cir. 1996); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

The ALJ is not bound by the opinion of the treating physician. *Smolen*, 80 F.3d at 1285. If a treating physician's opinion is uncontradicted, the ALJ must provide clear and convincing reasons for giving it less weight. *Lester*, 81 F.3d at 830. If the treating physician's opinion is contradicted by other opinions, the ALJ must provide specific and legitimate reasons supported by substantial evidence for rejecting it. *Id.* Likewise, the ALJ must provide specific and legitimate reasons supported by substantial evidence in rejecting the contradicted opinions of examining physicians. *Id.* at 830-31. The opinion of a non-examining physician, standing alone, cannot constitute substantial evidence. *Widmark v. Barnhart*, 454 F.3d 1063, 1066 n.2 (9th Cir. 2006); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993).

Here, the ALJ determined plaintiff could perform light work subject to certain limitations. The federal regulations and Social Security policy define light work as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b); Social Security Ruling ("SSR") 83-10.[4] The SSR notes the

---

[4] "The Commissioner issues Social Security Rulings to clarify the Act's implementing regulations and the agency's policies. SSRs are binding on all components of the SSA. SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with

15

requirement of "a good deal of walking or standing" is the characteristic that most often distinguishes light work from sedentary work. SSR 83-10. According to the SSR, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday," with the possibility of sitting intermittently during the remaining two hours of the day. *Id.*

Plaintiff here argues the ALJ failed to properly assess the opinions of Dr. Williams and Dr. Shook, and instead improperly relied on the opinion of Dr. Bernabe. P. Mem. at 3-4, 6. Both Dr. Williams and Dr. Shook opined plaintiff could only stand, walk, or sit for about two hours during an eight-hour workday. *See* AR at 510, 718. By contrast, Dr. Bernabe opined plaintiff could stand, walk, or sit for six hours during a workday. *Id.* at 356. And both Dr. Etemad and Dr. Bernabe opined plaintiff could lift and carry more than 10 pounds. *See id.* at 323, 356. Thus, in finding plaintiff could perform light work, the ALJ more closely followed Dr. Bernabe's opinion rather than Dr. Williams's or Dr. Shook's opinions. The court notes, however, that the ALJ only gave the opinion of Dr. Bernabe some weight, as she expressly rejected, or downgraded, portions of Dr. Bernabe's opinion suggesting a capacity for plaintiff to perform medium work. *See id.* at 30. The ALJ also considered the medical opinions of other physicians, and in fact gave Dr. Etemad's opinion greater weight than Dr. Bernabe's. *Id.* The ALJ credited the opinions of both of these examining physicians, Dr. Bernabe and Dr. Etemad, to the extent she found them consistent with their own clinical observations. *Id.* The opinions of examining physicians may constitute substantial evidence when they make "'independent clinical findings that differ from the findings of the treating physician.'" *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (quoting *Miller v. Heckler*, 770 F.2d 845, 849 (9th Cir. 1985)).

the statute or regulations." *Holohan*, 246 F.3d at 1203 n.1 (internal citations omitted).

The ALJ expressly gave only little weight to the opinions of Drs. Williams and Shook for three reasons.  First, the ALJ found their assessments were "not supported by detailed citation to clinical findings."  AR at 30.  Indeed, Dr. Williams presented her opinion regarding plaintiff's limitations on a form questionnaire in which she checked boxes to indicate the limitations and provided only ultimate diagnoses as the bases for the opined limitations.  *See id*. at 718-20.  Dr. Shook completed the same questionnaire and provided only slightly more detailed bases.  *See id.* at 510-12.  An "ALJ need not accept a treating physician's opinion which is brief and conclusionary in form with little in the way of clinical findings to supports [its] conclusions."  *Magallanes*, 881 F.2d at 751 (internal quotation marks and citations omitted); *see Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ properly discounted treating physician's opinion because, inter alia, "it was in the form of a checklist"; "an ALJ may discredit treating physicians' opinions that are conclusory, brief, and unsupported by the record as a whole").  Thus, the ALJ's first reason for discounting the treating physicians' opinions was specific and legitimate.

The second and thirds reasons given by the ALJ were, relatedly, that Dr. Williams's and Dr. Shook's opinions "exceed any limitations reflected on clinical examination, and appear to be based largely on the claimant's subjective allegations."  AR at 30.  These too were specific and legitimate reasons supported by substantial evidence.

The ALJ first rejected the treating physicians' limitation of plaintiff to light work.  *Id.*  As discussed above, Drs. Williams and Shook both opined plaintiff could only stand, walk, or sit for two hours in a workday, and lift or carry no more than ten pounds.  Dr. Williams's notes reflect plaintiff's complaints of numbness and pain, but little in the way of clinical observations prior to her rendering her June 2015 opinion.  *See, e.g., id.* at 615, 658, 704.  Dr. Williams noted plaintiff's lumbar radiculopathy and bulging disc, and may have relied on x-rays and an MRI

from the summer of 2014 that support these diagnoses. *See id.*; *see also id.* at 363, 366-70, 443-44. And indeed, the ALJ found plaintiff suffered from the severe impairment of degenerative disc disease of the lumbar spine. *Id.* at 25. But nothing in Dr. Williams's treatment notes or other clinical evidence indicates that plaintiff's lumbar spine disc disease resulted in limitations to the degree she opined.

Dr. Shook more clearly cites to the x-rays showing lumbar spine problems to support the limitations he opined as to plaintiff's standing and walking (*id.* at 511), but at the same time he observed plaintiff "ambulates without myelopathic findings." *See id.* at 589. In the summer of 2014, plaintiff reported to Dr. Etemadian that he was unsteady and had some numbness in his leg, and Dr. Fu observed plaintiff to have an unsteady gait and the absence of ankle jerk reflexes. *Id.* at 429, 439. But both before and after that, Drs. Patchett, Bernabe, Etemad, and Ali all observed plaintiff to have a normal gait and no apparent distress. *Id.* at 312, 321, 353, 488. The ALJ discussed the foregoing evidence, and also considered the impact of plaintiff's weight on his ability to ambulate, and reasonably concluded the evidence from the clinical examinations did not support the extreme limitations on sitting, standing, and walking opined by the treating physicians. *See id.* at 28-30.

As for the other limitations opined by the treating physicians to which the ALJ gave little weight, while Dr. Shook opined plaintiff had handling, fingering, and feeling limitations, Dr. Williams rejected that plaintiff had such physical impairments. *Id.* at 511, 719. Neither Dr. Patchett nor Dr. Etemad noted issues with plaintiff's hands, wrists, or fingers that would warrant handling, fingering, or feeling limitations, despite plaintiff exhibiting inconsistent grip strength in his hands. *Id.* at 312, 314, 319, 321. Thus, the ALJ properly rejected that portion of Dr. Shook's opinion.

The ALJ also properly rejected the environmental limitations opined by Dr.

Williams and Dr. Shook.  Dr. Williams opined plaintiff should be limited in his exposure to noise, fumes, odors, dusts, gases, poor ventilation, hazards, and extreme temperatures, humidity, and wetness, and hazards.  *Id.* at 512, 720.  Dr. Williams's environmental limitations were solely based on concern that extreme temperatures could worsen plaintiff's levels of pain, which does not even address most of these opined limitations, much less citing any clinical evidentiary support. *Id.* at 720.  Dr. Shook sought to limit plaintiff's concentrated exposure to extreme cold and heat and all exposure to machinery and other hazards.  *Id.* at 512.  Dr. Shook reasoned plaintiff had poor reflexes and control of his hands and feet.  *Id.* at 512.  Yet the medical record indicates there was little evidence of diabetic neuropathy or poor balance.  *Id.* at 353-55, 488, 645, 705.  Multiple doctors found no abnormalities or complaints in plaintiff's hands or feet.  *Id.* at 309-11, 319-21, 354-55.  And Dr. Patchett and Dr. Bernabe found plaintiff's reflexes were normal. *Id.* at 311, 355.  The medical record therefore provides a specific and legitimate reason supported by substantial evidence to reject the treating physicians' opined environmental limitations.

The ALJ implicitly adopted Dr. Williams's opined postural limitations that plaintiff be limited to occasional pushing and pulling, climbing ramps or stairs, stooping, crouching, kneeling, and crawling.  *See id.* at 27, 719-20.  This opinion is supported in part by the opinions of the non-examining state physicians.  *See id.* at 93-94, 116-17 (ALJ adopted postural limitations, including pushing or pulling and reaching limitations); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) (opinions of non-examining physicians "serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record").  The ALJ therefore had a valid basis to reject Dr. Shook's opinion that plaintiff could never stoop, crouch, or climb ladders.  *See* AR at 511.

In sum, the ALJ properly assessed the opinions of Dr. Williams and Dr. Shook, and she did not err in rejecting those opinions.

19

**B.** **The ALJ's RFC Assessment Is Supported by Substantial Evidence**

Residual function capacity is what one "can still do despite [his or her] limitations." 20 C.F.R. §§ 404.1545(a)(1)-(2), 416.945(a)(1). The Commissioner reaches an RFC determination by reviewing and considering all of the relevant evidence, including non-severe impairments. *Id.* Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence. P. Mem. at 16-17. Specifically, plaintiff contends the ALJ failed to address the effect of plaintiff's pain in his RFC determination, and failed to account for his mental impairments at all.

**1.** **Physical Impairments**

As noted above, the ALJ determined plaintiff had the RFC to perform light work, except he could only occasionally use his bilateral upper extremities for pushing, pulling, and reaching overhead, and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl, and is precluded from climbing ladders, ropes, or scaffolds. AR at 27. In reaching this determination, the ALJ discussed all of the medical evidence and opinions, and found the medical record does not support limitations that exceed the RFC finding. *Id.* at 29. Although plaintiff injured his shoulders and neck in a motor vehicle accident on the alleged onset date of disability, the ALJ reasoned plaintiff only received conservative treatment based on medication and a cervical medial branch block. *Id.* The ALJ further stated EMG and nerve conduction testing did not show cervical radiculopathy, while physical examinations were consistent with the RFC finding. *Id.* at 29-30; *see id.* at 497.

An "ALJ does not need to discuss every piece of evidence." *Howard v. Barnhart*, 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotations and citation omitted). But the ALJ is required to discuss significant and probative evidence. *See id.*; *Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Plaintiff complained of neck pain, and doctors noted degenerative spinal

issues along the neck, including degenerative changes and disease, tender neck muscles, and limited range of motion. AR at 307, 317, 429-31, 488, 545, 579-81. Similarly, plaintiff's complaints of shoulder pain are supported by a positive impingement sign on the right shoulder, positive Supraspinatus test in both shoulders, positive Hawkins', Neer's, O'Brien's, and Abduction's tests, and general muscle weakness. *Id.* at 308, 317-18. With regard to back pain, an MRI and x-ray revealed degenerative disc disease and 2mm disc bulges at L2-3 and L3-4. *Id.* at 366, 370, 443-44. A CT scan revealed severe facet arthropathy in the cervical spine. *Id.* at 302-03.

The objective medical evidence supports a finding of severe medical impairments. But portions of the medical evidence do not support the degree of symptoms plaintiff alleged. Although plaintiff complained of shooting pain, neurological examinations were normal. *See id.* at 311, 355. And despite complaints about difficulty with standing and walking, plaintiff ambulated without discomfort, with a normal gait, and with only slightly reduced leg strength. *See id.* at 373-75, 390, 393, 401, 488. In some examinations, plaintiff exhibited adequate strength and range of motion in the cervical spine and shoulders. *Id.* at 307-08, 313-14, 317-18, 322-23. The ALJ considered all of the opinion evidence, explaining which portions she gave weight to, and plaintiff's subjective complaints.

The ALJ did mischaracterize certain of the medical evidence. While the ALJ stated EMG testing did not indicate cervical radiculopathy (*see id.* at 29), Dr. Ali specifically noted that an EMG study conducted November 8, 2014 was "consistent with chronic cervical radiculopathy involving C5 and [sic] C6." *Id.* at 477. The ALJ thus erroneously mischaracterized the EMG study to support her RFC determination. Defendant concedes this, but accurately notes the ALJ identified cervical radiculopathy as a severe impairment at Step Two. D. Mem. at 3 n.2; *see* AR at 25. Therefore, despite the misstatement about the EMG study, the

ALJ did in fact consider plaintiff's cervical radiculopathy in her RFC determination. Though objective evidence of cervical radiculopathy could affect findings regarding plaintiff's pain or weakness in his upper extremities, thereby subjecting him to additional lifting, carrying, or reaching limitations, nothing in the record suggests the ALJ's mischaracterization affected her RFC finding, which was ultimately supported by substantial evidence in the medical record.

### 2. **Mental Impairments**

Plaintiff also argues that his mental impairments, although found to be non-severe, still should have been considered in his RFC determination. P. Mem. at 7-8; *see* SSR 96-8p ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). In determining plaintiff's RFC, the ALJ found plaintiff has no mental limitations. AR at 27.

The ALJ discussed plaintiff's mental impairments – namely, posttraumatic stress disorder and major depressive disorder – in determining which impairments were severe.[5] *Id.* First, in activities of daily living, the ALJ found plaintiff had only mild limitations because he could do light housework, walk the dog, do the dishes, shop, and vacuum with limitations due to pain. AR at 26; *see id.* at 238-41, 264-72. Second, in the area of social functioning, the ALJ found that plaintiff had mild limitation without further explanation. *Id.* at 26. Third, in the area of concentration, persistence, or pace, the ALJ again found only mild limitations without noting evidentiary support. *Id.* Fourth, the ALJ found no episodes of decompensation which have been of extended duration, pointing to plaintiff's

---

[5] The ALJ "considered the four broad functional areas set out in the disability regulations for evaluating mental disorders," which are known as the "paragraph B" criteria. AR at 26. The four areas of function, in which the ALJ must rate the degree of functional limitation, are: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of decompensation. 20 C.F.R. § 416.920a(c)(3).

diagnoses of major depressive disorder and post-traumatic stress disorder, but noting conservative medication treatment, and his failure to participate in group or individual therapy. *Id.*; *see id.* at 564, 638. The ALJ thus found plaintiff's mental impairments were non-severe and did not assess any mental impairment limitations in her RFC determination. *Id.* at 26-27.

Though plaintiff was diagnosed with major depressive disorder and posttraumatic stress disorder, he responded well to medical treatment. *See id.* at 418, 564 (noting plaintiff's mood as "moderately depressed"), 611-12 (plaintiff was aware that psychotropic medication was "working"). No episodes of decompensation were evident in the record. That plaintiff's mental conditions improved due to medication supports the ALJ's finding of no mental limitations. *See Warre v. Comm'r of Soc. Sec.*, 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits.").

Plaintiff also did not exhibit a loss of mental functioning that would impact his concentration, persistence, or pace. For example, plaintiff generally had good and appropriate affect, thought, insight, and judgment. *See* AR at 563-64, 612, 641-42, 699-701. On March 26, 2015, intake notes found plaintiff had sleep disturbance, decreased energy, concentration, and appetite, and he was distracted and irritable due to financial and medical stressors. *Id.* at 638. Yet this alone is not sufficient to establish that plaintiff's limitations in concentration, persistence, or pace were more than mild.

With regard to social functioning, plaintiff appeared pleasant with others and without apparent distress, such that a more restrictive limitation was not warranted. *See id.* at 361, 372, 419, 488. Plaintiff's activities of daily living similarly did not indicate such restrictive mental impairment limitation was evident. Nothing suggests plaintiff's mental impairments imposed any limitation on his mental functional capacity that warranted inclusion in his RFC.

Accordingly, the ALJ did not err in determining plaintiff's RFC, at least as discussed above. But plaintiff's RFC could change based on proper consideration of plaintiff's subjective complaints of pain, as discussed next.

**C.** **The ALJ Did Not Offer Clear and Convincing Reasons for Discounting the Credibility of Plaintiff's Subjective Complaints**

Plaintiff argues the ALJ failed to make a proper credibility determination. P. Mem. at 9-10; Reply at 5-6. Specifically, plaintiff contends the ALJ's reasons for discounting the credibility of his subjective complaints were not supported by substantial evidence. P. Mem. at 9-10.

The ALJ must make specific credibility findings, supported by the record. SSR 96-7p. To determine whether testimony concerning symptoms is credible, the ALJ engages in a two-step analysis. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, the ALJ must determine whether a claimant produced objective medical evidence of an underlying impairment "'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id.* at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). Second, if there is no evidence of malingering, an "ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281; *Benton v. Barnhart*, 331 F.3d 1030, 1040 (9th Cir. 2003).

"[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). To permit a meaningful review of the ALJ's credibility determination, the ALJ must "specify which testimony she finds not credible, and then provide clear and convincing reasons, supported by evidence in the record, to support that credibility determination." *Id.*; *see Treichler v. Comm'r of Soc. Sec.*, 775 F.3d 1090, 1102 (9th Cir. 2014) (The ALJ must "'specifically

identify the testimony [from a claimant] that she or he finds not to be credible and . . . explain what evidence undermines the testimony.'") (quoting *Holohan*, 246 F.3d at 1208).

The ALJ may consider several factors in weighing a claimant's credibility, including: (1) ordinary techniques of credibility evaluation such as a claimant's reputation for lying; (2) the failure to seek treatment or follow a prescribed course of treatment; and (3) a claimant's daily activities. *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); *Bunnell*, 947 F.2d at 346-47. But "subjective pain testimony cannot be rejected on the *sole* ground that it is not fully corroborated by objective medical evidence." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001) (emphasis added) (citation omitted).

At the first step, the ALJ here found plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms alleged. AR at 27. At the second step, because the ALJ did not find any evidence of malingering, the ALJ was required to provide clear and convincing reasons for discounting the credibility of plaintiff's testimony.

As an initial matter, the ALJ failed to specifically identify the testimony from plaintiff that she found not credible. *See Brown-Hunter*, 806 F.3d at 489; *Treichler*, 775 F.3d at 1102. Here, the ALJ merely stated: "The claimant alleges disabling limitations due to his symptoms including difficulties with maneuvering, manipulation and exertion." AR at 27. This falls short of specifying the testimony she found not credible, and makes it difficult for this court to review the credibility determination.

But even if the ALJ had specified the testimony she discounted, her reasons given were not clear and convincing. The ALJ found plaintiff's testimony to be not entirely credible because: (1) plaintiff's alleged limitations were not corroborated by the objective medical evidence; and (2) plaintiff received only conservative treatment. *Id.* at 29-30. Defendant also argues plaintiff's credibility

25

is undermined because he left his most recent job due to being laid off, rather than due to his medical condition, and his daily activities are inconsistent with his allegations. D. Mem. at 8. The court rejects defendant's arguments that the ALJ's credibility determination should be upheld because plaintiff left his most recent work due to being laid off and because of his daily activities. These were not reasons cited by the ALJ for her credibility determination. The court can only review the reasons actually provided by the ALJ. *See Orn*, 495 F.3d at 630 ("We review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely.") (citation omitted).

The court will not analyze the first reason given by the ALJ in detail because, as noted above, lack of corroboration by the objective medical evidence cannot, standing alone, constitute a clear and convincing reason for rejecting plaintiff's subjective complaints. *See Rollins*, 261 F.3d at 857. The court does note, however, that in addition to failing to identify what testimony she found incredible in light of the medical record, the ALJ also failed to explain how the medical record undermines plaintiff's credibility.

The ALJ also rejected plaintiff's testimony because he obtained only conservative treatment for his alleged pain conditions. AR at 29. Evidence of conservative treatment may form the basis for undermining plaintiff's credibility regarding the severity of the ailment. *Tommasetti*, 533 F.3d at 1039; *see Parra v. Astrue*, 481 F.3d 742, 750-51 (9th Cir. 2007) ("evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment") (citation omitted); *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (reasoning "conservative treatment" is indicative of "a lower level of both pain and functional limitation"); SSR 96-7 ("the [plaintiff]'s statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

Plaintiff here testified that he relied on pain medication treatments for his nerve pain. AR at 55. The medical record reflects plaintiff regularly took various pain medications that did not relieve his pain symptoms. *See id.* at 352, 361, 372. Dr. Patchett characterized plaintiff's medication-based treatment as "conservative." *Id.* at 313. Dr. Bernabe noted plaintiff also received heat and massage treatment. *Id.* at 352. In 2013, both Dr. Patchett and Dr. Etemad recommended plaintiff seek physical therapy or rehabilitation treatment, and Dr. Etemad additionally recommended steroid injections. *See id.* at 324, 326, 329, 333.

When plaintiff presented to the emergency department for his low back pain in 2014, his only documented treatment was prescription medication and sporadic intake of ibuprofen; he had not undergone physical therapy, chiropractic evaluation or treatment, or image testing. *Id.* at 361. Both plaintiff and his wife expressed an interest in stronger pain medication. *Id.* In March 2015, plaintiff was evaluated for occupational therapy, but he missed an earlier appointment. *Id.* at 645-47, 648.

Plaintiff used an array of medications, including narcotics such as Norco and hydrocodone, and non-narcotics such as ibuprofen, Gabapentin, and Toradol. The use of prescribed narcotic medication, by itself, may be considered conservative treatment. *See Huizar v. Comm'r*, 428 Fed. Appx. 678, 680 (9th Cir, 2011) (finding that plaintiff responded to conservative treatment, which included the use of narcotic medication); *Higinio v. Colvin*, 2014 WL 47935, at *5 (C.D. Cal. Jan. 7, 2014) (holding that, despite the fact that plaintiff had been prescribed narcotic medication at various times, plaintiff's treatment as a whole was conservative). But, in general, the Ninth Circuit and its district courts have viewed the use of narcotic pain medication as non-conservative treatment, at least when in conjunction with other treatments that were also not conservative. *See, e.g.*, *Lapierre-Gutt v. Astrue*, 382 Fed. Appx. 662, 664 (9th Cir. 2010 (treatment consisting of "copious" amounts of narcotic pain medication, occipital nerve blocks, and trigger point injections was not conservative); *Christie v. Astrue*, 2011

WL 4368189, at *4 (C.D. Cal. Sept. 18, 2015) (treatment with narcotics, steroid injections, trigger point injections, epidural injections, and cervical traction was not conservative).

Plaintiff here also received epidural injections for his pain management. *See* AR at 555. At the hearing, plaintiff testified he had just undergone a bilateral cervical medial block to locate the nerves in his neck for potential surgery. *Id.* at 48. Plaintiff was scheduled to have "another set of shots" – likely four more shots – within a week from the hearing. *Id.* at 48, 54. The injections were supposed to numb the nerve pain in his neck, but it did not last long and plaintiff "felt hardly any relief." *Id.* at 54. Some courts have characterized limited or one-time injections as conservative treatment. *See, e.g.*, *Jones v. Comm'r*, 2014 WL 228590, at *7 (E.D. Cal. Jan. 21, 2014) (occasional use of epidural injections in conjunction with massages and anti-inflammatory medications could be considered conservative); *Gonzales v. Colvin*, 2015 WL 685347, at *11 (C.D. Cal. Feb. 18, 2015) (treatment consisting of medication and a single steroid injection was conservative). In contrast, other courts have deemed this treatment not conservative, in particular when a claimant was treated with other injections and narcotic pain medication. *See, e.g.*, *Yang v. Colvin*, 2015 WL 685347, at *11 (C.D. Cal. Jan. 20, 2015) (collecting cases finding spinal epidural injections not conservative); *Christie*, 2011 WL 4368189, at *4. Here, plaintiff received at least one set of injections, and he had another set scheduled shortly after his hearing before the ALJ, in addition to the narcotics medication. Considering the injection and medication treatment in totality, the court rejects the ALJ's finding that the use of a medial block amounted to plaintiff receiving conservative treatment.

Moreover, plaintiff's diabetic condition precluded surgery during earlier periods of treatment. *See* AR at 626 (noting plaintiff was previously not considered an operative candidate); *see also Orn*, 495 F.3d at 638 (conservative treatment is "not a proper basis to reject a claimant's credibility where the claimant

has a good reason for not seeking more aggressive treatment"). At the hearing, plaintiff testified he was now able to undergo surgery to treat his neck pain because his diabetic condition was under control, though it was unclear at the time of the hearing whether surgery was an available option. *See* AR at 52-58. While plaintiff was no longer excused from avoiding surgery due to his improved diabetes condition, he appeared ready to pursue such treatment if, and when, it became necessary. Thus, although it appears plaintiff initially failed to pursue all available courses of treatment such as physical therapy or rehabilitation, his later use of pain medications, including narcotics and epidural injections, reflected his pursuit of aggressive, not conservative, treatment. The ALJ's finding that plaintiff received conservative treatment was not supported by substantial evidence.

In sum, the ALJ failed to cite sufficient clear and convincing reasons for discounting plaintiff's credibility. As such, the ALJ erred in discounting the credibility of plaintiff's subjective complaints.

**D.     The ALJ's Erred by Failing to Properly Consider the Lay Testimony**

Plaintiff argues the ALJ failed to properly evaluate the statement of lay witness Marlene G. P. Mem. at 10. Specifically, plaintiff contends the ALJ failed to provide legitimate reasons for disregarding the observations of the lay witness. *Id.*

"[L]ay testimony as to a claimant's symptoms or how an impairment affects ability to work *is* competent evidence and therefore *cannot* be disregarded without comment." *Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir. 2006) (internal quotation marks, ellipses, and citation omitted); *see Smolen*, 80 F.3d at 1288; *see also* 20 C.F.R.§§ 404.1513(d)(4), 416.913(d)(4) (explaining that the Commissioner will consider all evidence from "non-medical sources," including "spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy"). The ALJ may only discount the testimony of a lay witness if he provides specific "reasons that are germane to each witness." *Dodrill v. Shalala*, 12 F.3d 915, 919

(9th Cir. 1993); *see Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001) ("Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he or she expressly determines to disregard such testimony and give reasons germane to each witness for doing so.").

Marlene G., plaintiff's wife, completed a Third Party Function Report in August 2014, while she and plaintiff resided in a mobile home.  AR at 252-60.  In the Function Report, Ms. G. reported plaintiff could not lift objects over 5 pounds, could not bend or stand very long, had trouble raising his arms over his head, and had a herniated disc in his lower back.  *Id.* at 252.  Ms. G. stated she assisted plaintiff with bathing, dressing, caring for their dog, and "every thing he does." *Id.* at 253-54.  Ms. G. observed plaintiff sits and lays down most of the day due to the pain in his neck and back, the pain keeps plaintiff up at night, and he cannot do house or yard work; however, plaintiff could drive a car, shop in stores for food, handle money, and could walk 1/2 a block before needing to rest.  *Id.* at 253-58.

The ALJ gave Ms. G.'s opinion only limited weight because Ms. G's opinion merely reiterated plaintiff's subjective allegations and were "not fully corroborated by the medical evidence."  *Id.* at 30.  In other words, the ALJ rejected Ms. G.'s opinion to the extent it was not supported by the medical evidence.

An ALJ may reject lay testimony if it is *inconsistent* with medical evidence, but not if it is simply *unsupported* by medical evidence.  *Compare Lewis*, 236 F.3d at 511 ("One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.") (citing *Vincent*, 739 F.2d at 1395) with *Diedrich v. Berryhill*, 874 F.3d 634, 640 (9th Cir. 2017) (a lack of support from the medical evidence is not a proper basis for disregarding lay observations); *Bruce v. Astrue*, 577 F.3d 1113, 1116 (9th Cir. 2009) (same).  In finding that a lack of support from medical evidence is not a germane reason to discount lay testimony, the Ninth Circuit notes that the "fact that lay testimony . . . may offer a different perspective than medical records alone is precisely why such evidence is valuable at a

hearing." *Diedrich*, 874 F.3d at 640 (citing *Smolen*, 80 F.3d at 1289).

Arguably, Ms. G.'s statement that plaintiff was unable to perform daily activities was inconsistent with the objective findings and record. For example, the record undermines Ms. G.'s report that plaintiff had difficulty walking or standing. As discussed above, on some occasions plaintiff demonstrated unsteady gait, numbness in his leg, or a positive straight leg raising sign on the left side. *See* AR at 429, 439, 704. But on other occasions plaintiff also exhibited a normal walk, a negative straight leg raise bilaterally, and no numbness or weakness in his lower extremities. *See id.* at 312, 321, 353, 361-62, 373, 488. Yet the ALJ reasoned that the medical record did not support Ms. G.'s lay opinion regarding plaintiff's condition, rather than reason that Ms. G.'s statement was inconsistent with the medical record. The ALJ's reason was thus improper.

Accordingly, the ALJ did not provide a germane reason for discounting the Third Party Function Report of Ms. G.

## V.

## **REMAND IS APPROPRIATE**

The decision whether to remand for further proceedings or reverse and award benefits is within the discretion of the district court. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989). Typically, in accordance with the "ordinary remand rule," the reviewing court will remand to the Commissioner for additional investigation or explanation upon finding error by the ALJ. *Treichler*, 775 F.3d at 1099. Nonetheless, it is appropriate for the court to exercise its discretion to direct an immediate award of benefits where: "(1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinions; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison v. Colvin*, 759 F.3d 995, 1020 (9th Cir. 2014)

(setting forth three-part credit-as-true standard for remanding with instructions to calculate and award benefits). But where there are outstanding issues that must be resolved before a determination can be made, or it is not clear from the record that the ALJ would be required to find a plaintiff disabled if all the evidence were properly evaluated, remand for further proceedings is appropriate. *See Benecke v. Barnhart*, 379 F.3d 587, 595-96 (9th Cir. 2004); *Harman v. Apfel*, 211 F.3d 1172, 1179-80 (9th Cir. 2000). In addition, the court must "remand for further proceedings when, even though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, there are outstanding issues to be resolved and remand is required. On remand, the ALJ shall reconsider plaintiff's subjective complaints and either credit his testimony or provide clear and convincing reasons supported by substantial evidence for rejecting it, and reconsider the lay testimony and either credit it or provide germane reasons supported by substantial evidence for rejecting it. The ALJ must then reassess plaintiff's RFC and proceed through steps four and five to determine what work, if any, plaintiff was capable of performing.

## VI.

## CONCLUSION

IT IS THEREFORE ORDERED that Judgment shall be entered REVERSING the decision of the Commissioner denying benefits, and REMANDING the matter to the Commissioner for further administrative action consistent with this decision.

DATED: January 31, 2019

SHERI PYM
United States Magistrate Judge

32